**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|   |   |   |
|---|---|---|
| NICHOLAS DESANTIS, | : | |
| | : | Civil Action No. |
| Plaintiff, | : | 06-1807(NLH) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ALDER SHIPPING CO., | : | |
| FRESH DEL MONTE | : | |
| PRODUCE, INC., | : | |
| DEL MONTE FRESH | : | |
| PRODUCE, N.A., INC. | : | |
| DEL MONTE FRESH PRODUCE CO. | : | |
| | : | |
| Individually, jointly and | : | |
| severally, | : | |
| Defendants. | : | |

---

**APPEARANCES:**

STANLEY GRUBER
1601 MARKET STREET, 2ND FLOOR
PHILADELPHIA, PA 19103
*Attorney for Plaintiff, Nicholas DeSantis*

EUGENE MATTIONI
MATTIONI, LTD.
399 MARKET STREET SUITE 200
PHILADELPHIA, PA 19106
*Attorney for Defendant, Alder Shipping Company*

STEPHEN CALDER
PALMER BIEZUP & HENDERSON LLP
330 MARKET STREET
CAMDEN, NJ 08102
*Attorney for Defendants, Del Monte Fresh Produce, N.A., Inc.,*
*Fresh Del Monte Produce, Inc., and Del Monte Fresh Produce Co.*

**HILLMAN**, District Judge

This matter comes before the Court on the Alder

1

Shipping Company's motion for summary judgment on plaintiff's claim under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), as well as the Del Monte defendants' joint motion for summary judgment on plaintiff's LHWCA and federal maritime tort law claims.  For the reasons expressed below, Alder's motion will be denied and the Del Monte defendants' motion will be granted.

## BACKGROUND

Plaintiff has brought a negligence action against Alder Shipping Co. ("Alder"), Del Monte Fresh Produce, N.A., Inc. ("Del Monte N.A."), Fresh Del Monte Produce, Inc., and Del Monte Fresh Produce Co. under the LHWCA and federal maritime tort law. Plaintiff alleges that he was injured while engaged in cargo operations on board the M/V Alma.  Specifically, plaintiff alleges that he fell on April 14, 2005 after a cardboard box filled with cantaloupes collapsed under his weight.  Both parties agree that there was no "walking board" on top of the cardboard box that collapsed.

At the time that injury occurred, the M/V Alma was docked at Broadway Terminal in Camden, New Jersey for the purpose of unloading a cargo of cantaloupes shipped in pallets of cardboard boxes.  The M/V Alma is a refrigerated vessel owned by Alder and equipped with four cargo hatches.  Del Monte N.A. functions as a terminal operator, leasing the facility at Broadway Terminal and coordinating terminal and warehouse

2

operations for the incoming fruit cargo.  Del Monte N.A.
contracted with Delaware River Stevedores Inc. ("DRS") to provide
the labor for unloading the fruit cargo from the arriving
vessels.  Plaintiff was a longshoreman employed by DRS.  Prior to
the date of his accident, plaintiff had worked on approximately
one hundred ships loaded with fruit.

Del Monte Fresh Produce Co. is the parent company of
Del Monte N.A.  Fresh Del Monte Produce Inc. is a foreign
corporation and the indirect parent of both Del Monte Fresh
Produce Co. and Del Monte N.A.  Neither party disputes that a Del
Monte subsidiary chartered the M/V Alma for the journey from
Costa Rica, where the fruit originated, to Camden.[1]

When the cantaloupes were stowed in M/V Alma's cargo
hatches at the loading port in Costa Rica, slings were placed
around the pallets of fruit that were slated to be discharged
first.  The cargo was loaded by the stevedore company,
Comercializadora Anfo, S.A., which is not an affiliate or a
contracting partner with any of the Del Monte defendants in this
matter.  Whatever walking boards were used to load the cargo in
Costa Rica were removed and the cargo shipped to Camden without

---

[1] The parties do disagree about which Del Monte subsidiary
was actually the charterer. That dispute is not material to the
issues now before the court.

them.[2]

On the day of his injury, plaintiff and three other longshoremen were tasked with going down into Hatch 1 and attaching cargo hooks on the pre-placed slings so that the first pallets could be lifted out of the hatch.  When they arrived at Hatch 1, the hatch cover was open.  The top of the cargo was approximately eight to ten feet below the cargo hatch.  At approximately 7:00 a.m., plaintiff and another longshoreman placed a portable ladder into Hatch 1 to allow access down into the hatch.[3]  With Plaintiff and one longshoreman holding the ladder, the two other longshoremen entered the hatch, apparently without incident.  With one longshoreman holding the ladder, plaintiff then climbed down into the hatch.  When plaintiff took his second foot off of the ladder and stepped down on top of the cardboard boxes of cantaloupes, two of the boxes collapsed and the plaintiff fell.  Plaintiff broke his left wrist in an attempt to brace himself as he fell.

---

[2]Plaintiff, citing the testimony of Mr. Albano, a Del Monte, N.A. employee, contends that "Del Monte" ordered that the walking boards be removed.  While this conflates the Del Monte entities and we have our doubts that this is a fair characterization of Albano's testimony, we will assume for purposes of summary judgment that Del Monte N.A. approved the shipment without walking boards.  As we note later, a terminal operator has no general obligation to require walking boards on cargo loaded, carried, and discharged by other entities.

[3] The portable ladder was necessary because the ship's fixed ladders were blocked by the cargo.

A walking board is a piece of plywood, approximately four feet by four feet.  There is no dispute that walking boards serve to protect the fruit from being trampled on by stevedores. Plaintiff also contends that walking boards serve to decrease the risk to longshoremen of falls.  Typically, Del Monte or one of its subsidiaries owns the walking boards but on occasion when a Del Monte subsidiary charters a vessel for a one time run, the vessel owner will provide its own walking boards.  Each board has a hole drilled in it, in order to allow for ventilation during shipment and easier handling by longshoremen.  John Hamilton, a DRS Stevedore Supervisor, testified in his deposition that of the thousands of ships that arrived at the Broadway Terminal, approximately 90 percent of them came already equipped with walking boards.  Additional walking boards were kept in a building about 300 yards from where the M/V Alma was docked on the day of the injury.

Walking boards have been the subject of many letters and emails between Del Monte N.A. and DRS.  The following is a list of relevant correspondence between Del Monte N.A. and DRS. In October 1998, Ernie Casper, Port Manager for Del Monte N.A., sent a letter to Robert Palaima, DRS President, notifying DRS that Del Monte N.A. did not want fruit walked on during unloading operations.  Palaima responded by telling Casper about some additional walking boards that they constructed out of plywood

but also told Casper that the best solution to the problem would be to have walking boards in place when the vessel arrived.

In 2000, Casper sent Palaima an email notifying him that Sergio Mancilla, then-Senior Vice President of Shipping Worldwide for Del Monte N.A., had instructed vessel staff to report any walking on fruit and stop unloading until the situation was remedied.

On January 7, 2000, Frank Timothy Albano, Vice President of Vessel Scheduling, North American Port Operations, sent Casper an email expressing his concern for how stevedores were disregarding Del Monte N.A.'s instructions to use walking boards and the adverse effect on the quality of the fruit. Albano instructed Casper to reiterate to DRS that its employees should use walking boards during unloading operations.

That same day, Casper sent a letter to Palaima informing him that some vessels will continue to arrive without walking boards but that this does not give DRS "the right to walk on the cargo." (Pl.'s Ex. 12.) Casper also expressed his concern about ladders being placed on top of boxes of fruit instead of walking boards.

On August 28, 2001, Casper sent a letter to DRS informing the stevedore company that he observed longshoremen removing some loose walking boards from the cargo hatch and walking on fruit. Casper instructed DRS to find employees that

would comply with their directive to use walking boards.

On October 31, 2001, Casper sent another letter to DRS informing the stevedore company that he again observed stevedores failing to use walking boards.  Again, Casper instructed DRS to find employees who would use walking boards.

<b><u>DISCUSSION</u></b>

## I.   Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

## II.  Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect

7

the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

## III. Analysis

### A. Alder Shipping Company

Alder argues that it did not breach any of the duties imposed on it by § 905(b) of the LHWCA. 33 U.S.C. § 905(b).

8

Plaintiff counters that defendant Alder breached its duty to turn the ship over in a safe condition.  In 1972, Congress amended the LHWCA to "shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries, the stevedore-employer ...." Howlett v. Birkdale Shipping Co., S. A., 512 U.S. 92, 97 (1994).  However, a longshoreman may still bring an action under the LHWCA against the owner of the vessel when his injury was "caused by the negligence of a vessel."  33 U.S.C. § 905(b).  The LHWCA, however, does not specify which acts or omissions would constitute negligence.  Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 167 (1981).  The Supreme Court has held that a vessel owes the following duties to longshoremen:

> (1) a turnover duty, requiring it to turn over the ship and its contents in safe working condition, and to warn if they are in a dangerous condition; (2) an active participation duty, to exercise due care in protecting longshoremen from hazards in equipment or areas under the active control of the vessel; and (3) a duty to intervene, if the vessel has actual knowledge of a dangerous condition and reason to believe that the stevedore will not remedy it.

Goldsmith v. Swan Reefer A.S., 173 Fed. Appx. 983, 986 (3d. Cir. 2006) (citing Scindia, 451 U.S. at 167, 175-79).  Both parties agree that this case only concerns the turnover duty.

The turnover duty, in turn, encompasses two separate duties: one "basic" and one "corollary."  The nature of a vessel's turnover duty, whether basic or corollary and its scope, depends on both the location and obviousness of the defect.  The

9

basic turnover duty concerns open and obvious dangers and holds vessels liable for failure "to turn over the ship in such a condition that an expert stevedore acting with reasonable care can conduct cargo operations reasonably safely." Kirsch v. Plovidba, 971 F.2d 1026, 1029 (3d Cir. 1992).

The corollary turnover duty concerns latent conditions and holds vessels liable for failure to "warn of hidden hazards that a competent stevedore is likely to encounter ...." Id. [4] The location of the defect in the cargo stow and cargo area, as opposed to the ship's gear, equipment, tools, and workplace, narrows the vessel's corollary duty to warn. Howlett v. Birkdale Shipping Co., 512 U.S. 92, 105 (1994); Derr v. Kawasaki Kisen K.K., 835 F.2d 490, 496. In Howlett, the Supreme Court held that "[f]or the purposes of delineating the scope of a shipowner's turnover duty ... the cargo stow is separate and distinct from other aspects of the ship." Howlett, 512 U.S. at 104. As it relates to the cargo stow and cargo area, the turnover duty to warn

> attaches only to latent hazards, defined as hazards that are
> not known to the stevedore and that would be neither obvious
> to nor anticipated by a skilled stevedore in the competent
> performance of his work ... [T]he duty encompasses only
> those hazards that are known to the vessel or should be
> known to it in the exercise of reasonable care.

_____

[4] Although not applicable here, in general the obviousness of the injury causing condition is a question of fact for the jury to decide. Kirsch, 971 F.2d at 1033.

Id.

      The differing rules with respect to cargo operations and the ship and its equipment is based on Congress' intention to place liability for injuries on the party who controls the area where the injuries occurred.  Howlett, 512 U.S. at 105; Hill v. NSB Niederelbe Schiffahrtsges MBH & Co., No. Civ. A. 02-2713, 2003 WL 23162396, at *4 (E.D.Pa. Dec. 30, 2003).  Accordingly, the Supreme Court has held that a vessel does not have a duty to supervise or inspect the work of stevedores, during or between cargo operations.  Howlett, 512 U.S. at 104.  Therefore, "to trigger a vessel's turnover duty to warn of a defect in the cargo stow a litigant must show that (1) the shipowner had knowledge or should have had knowledge in the exercise of reasonable care of the defect and (2) that the defect would not be obvious to a competent stevedore."  Frederico v. Guangzhou Ocean Shipping Co., 1997 WL 634374 at * 3 (E.D. Pa. Sep 29, 1997).[5]

---

    [5] In contrast, a plaintiff does not have to show that the shipowner knew or should have known of the defect when the defect is in ship's gear, equipment, tools, and workplace because the vessel has a duty to inspect this area.  The distinction between cargo operations and the ship's gear, equipment, tools, and workplace is a contested issue in a number of cases.  Hill, 2003 WL 23162396, at *4.  In Howlett, the Supreme Court held that a sheet of clear plastic laid under the cargo that was provided by the vessel owner was part of the cargo operations.  Id., 512 U.S. at 105-6.  In Kirsch, the Third Circuit held that an oil slick within the cargo stow was part of the vessel's workplace because the cargo stow was empty.  Id., 971 F.2d at 1032 n. 7.  In Derr, the Third Circuit held that displaced cargo that fell on a longshoremen was part of the cargo operations.  Id., 835 F.2d at 495-96.  Slings owned by the terminal operator that were used to

Here, there does not appear to be any legitimate dispute that the alleged defect - lack of walking boards - was part of the cargo operations.  Typically, walking boards are placed in the cargo stow by stevedores.  A walking board is essentially an extension of the cargo pallet.  Therefore, in order to invoke liability under the corollary turnover duty plaintiff must prove that the lack of walking boards was a latent defect and that Alder knew or should have known of their absence.

Plaintiff argues in his statement of material facts that the absence of walking boards was not open and obvious.[6] However, any reasonable jury would decide that the absence of walking boards was open and obvious.  Plaintiff was working in daylight conditions with clear weather.  In his deposition, plaintiff testified that on the day of his injury he had a clear view of the hatch and that there was nothing obstructing his view of where he was putting his feet.  The hatch was open when he arrived.  Before being injured, plaintiff looked down into the cargo hold and lowered a straight ladder down.  Plaintiff also testified that the hatch where he was injured was a square area that fit 36 by 36 pallets of fruit, certainly large enough to

---

help unload the cargo from the hatch are part of the cargo operations. Mullen v. Alicante Carrier Shipping Corp. I, 2004 WL 1737493 (E.D.Pa. Aug. 03, 2004).

[6] We note that plaintiff assumes in his brief - in our view somewhat incongruously - that the hazard of walking on fruit was in contrast open and obvious.

12

provide plaintiff with a clear view.

We conclude that this case concerns an open and obvious danger in the cargo area. Since the defect is obvious as opposed to latent, the Court does not need to consider whether Alder knew or should have known of the lack of walking boards.[7] Alder did not have the corollary duty to warn of the lack of walking boards, an open and obvious condition directly concerning the cargo and the cargo area.

Even though this Court finds that no reasonable juror could conclude that Alder breached its corollary duty to warn plaintiff of any latent danger in the cargo hold, this Court must also determine if Alder breached their basic turnover duty, which concerns open and obvious hazards. See Jackson v. Egyptian Navigation Co., 364 F.3d 113, 117-18 (3d Cir. 2004) (analyzing the basic turnover duty for an open and obvious danger in the cargo stow); see also Hill, 2003 WL 23162396, at *8 (holding that obviousness in the cargo stow is not an absolute bar to

---

[7] Aleksndr Volicev, the ship's master, testified in his deposition that he knew that there was no walking boards on the M/V Alma when it arrived in Camden on the day of the injury. (Volicev Dep. 39.); see Wheelings v. Seatrade Groningen, BV, 516 F.Supp.2d 488, 502 (E.D.Pa. 2007) ("Certain crew members may hold positions such that their knowledge should be attributed to the vessel.")

recovery).[8]

　　　　Ordinarily, the vessel can rely on the expertise of a stevedore to avoid open and obvious dangers.  Kirsch v. Plovidba, 971 F.2d 1026 (3d Cir. 1992).  Thus, the vessel does not have a duty to warn about or mitigate against obvious but easily avoidable dangers.  Id. at 1030.  However, the Third Circuit described a two-pronged exception to this general principle; an impracticality prong and a confrontation prong:

> [w]hen a ship is turned over to the stevedore with an open and obvious hazard which injures a longshoreman, the ship will be liable, first, if avoiding the hazard would be impractical for the longshoreman, or second, if the ship should have known that the longshoremen would confront the hazard.

Hill v. Reederei F. Laeisz G.M.B.H., 435 F.3d 404, 423 (3d Cir. 2006).

　　　　As for the practicality of avoiding the hazard, a plaintiff does not have to show that "it was absolutely impossible to avoid the hazard ...."  Kirsch, 971 F.2d at 1030.  Instead, a plaintiff need only show that "under all the

---

[8] Some courts have held that a vessel cannot be liable for an open and obvious defect in the cargo operations.  Mullen v. Alicante Carrier Shipping Corp. I, 2004 WL 1737493 at *4 (E.D.Pa. August 03, 2004).  However, we interpret Howlett as limited exclusively to the vessel's corollary duty.  Id., 512 U.S. at 99 ("although both components of the turnover duty are related in various respects, Howlett confines his case to an allegation that [defendant] failed to warn ...").  This interpretation of Howlett is consistent with the Third Circuit's approach, post-Howlett, to consider the basic duty separately in a case involving an open and obvious cargo danger.  See Jackson, 364 F.3d at 117-18.

circumstances, safer alternatives were impractical." Id.  In
Hill, the court reasoned that a longshoreman may be presented
with the choice of either working under dangerous conditions or
leaving the job.  Hill, 435 F.3d at 410 (citing Napoli v.
(Transpacific Carriers Corp. & Universal Cargo Carriers, Inc.)
Hellenic Lines, Ltd., 536 F.2d 505, 509 (2d Cir. 1976)).  The
practicality of safer alternatives is determined solely by the
circumstances of the case.  Hill, 435 F.3d at 410.  Thus, the
fact-intensive nature of determining the impracticality of
avoiding an obvious hazard makes deciding the issue on summary
judgment inappropriate in many cases.  Kirsch, 971 F.2d at 1030.[9]

        Even if it is practical to avoid the obvious danger, a
vessel can still be liable when the vessel cannot reasonably
expect a stevedore to avoid the obvious danger.  Id. at 1030-31.
The vessel's reasonable expectations about whether or not a
stevedore will avoid an obvious danger or confront it are
determined by positive law, custom, contract, and the frequency

---

[9]  Although Kirsh held that summary judgment is often
inappropriate in these cases, the Third Circuit actually awarded
summary judgment in that case.  In Kirsch, a longshoreman brought
an action against the owner of a vessel under the LHWCA after he
slipped and fell on an oil spill while loading cargo.  Kirsch,
971 F.2d at 1027.  It was undisputed that the oil spill was an
open and obvious danger.  The Third Circuit affirmed the awarding
of summary judgment to the vessel because the longshoremen was
unable to present evidence that the owner of the vessel would
have acted unreasonably to assume that the stevedore who employed
the plaintiff would avoid the oil spill, in light of custom.  Id.
at 1033.

with which longshoremen find themselves faced with the hazard at issue. <u>Hill</u>, 435 F.3d at 410. [10]

Here, defendant argues that plaintiff lacks sufficient evidence on both prongs of the <u>Hill</u> test for liability arguing it was both practical to avoid the hazard by placing down walking boards and that it was reasonable to expect plaintiff to avoid the danger.

Turning first to the practicality prong, it appears that the parties agree that a distance of 8 to 10 feet separated the top of the boxes and the deck of the ship.  Under these circumstances the record evidence suggests there are two ways for a longshoreman to place walking boards on top of boxes of fruit. A longshoreman can either throw them down into the hatch, which is the usual method, or he can lower them down using a sling. Contrary to defendant's argument, a reasonable juror could conclude that neither of these methods was practical under the circumstances of this case.

According to Stevedore Supervisor John Hamilton, the walking boards act as "sails" when a longshoreman throws it down

---

[10] The alternate paths for determining the scope of the open and obvious turnover duty do overlap but they are not identical. <u>Hill</u>, 435 F.3d at 410.  A shipowner still has a duty to mitigate against rarely-occurring but difficult to avoid conditions.  <u>Id</u>. Further, while the knowledge of the shipowner and the frequency of the occurrence of the hazard at issue play into the confrontation prong, they have no effect on the impracticality prong. <u>Id</u>.

16

into the hatch.  (Hamilton Dep. 61.)  As a result, the walking
boards do not always lay flat and they "end up all over the
place."  (Id.)  After throwing the walking boards, a longshoreman
then has to go down into the hatch and move the walking boards,
presumably so that they fit properly on top of the cargo.  (Id.
at 50.)  According to Hamilton, it can be very difficult to move
the walking boards around without stepping on the fruit boxes.
(Id.)

     As for using a sling to lower walking boards down into
the stow, this method requires a longshoreman to first go down
into the hatch and walk on boxes of fruit without walking boards.
Defendant Alder has submitted no evidence of a practical method
for laying down walking boards.  Given these circumstances, a
jury could reasonably decide that these safer alternatives were
impractical.[11]

     As for the confrontation prong of the Hill test, what
is "reasonable" about Alder's expectations that a stevedore would
successfully avoid the danger caused by the absence of walking
boards is also in dispute here, making summary judgment
inappropriate.  On the one hand, one can say Adler was aware of
longstanding strict instructions not to walk on the fruit, that
walking boards would have been available nearby, and that the

---

     [11]  As we noted earlier, under this prong of the Hill test it
is not relevant whether Alder had any knowledge of the difficulty
of placing walking boards on top of the boxes of fruit.

17

stevedoring company knew how to use them.  On the other hand, the evidence also supports the notion that it was both customary in the industry for longshoremen to decline to lay down walking boards, that despite past instructions the Del Monte fruit shipments were still being walked on, and that this particular ship had been unloaded the week before without walking boards.[12] Moreover, the email that Casper sent to Palaima in 2000 suggests that it was customary for vessel staff to instruct stevedores about walking boards.  In sum, we conclude that a reasonable jury could differ as to whether it was reasonable to expect that the plaintiff would avoid rather than confront the danger.

Alder also argues that it should not be held liable because plaintiff himself failed to place the walking boards down.  While this argument may ultimately prevail with a jury, this argument is only relevant now on the issue of plaintiff's comparative negligence.  Courts must treat the turnover duty and the comparative negligence of the longshoremen as exclusive of each other.  Kirsch, 971 F.2d at 1031, n. 6.  This Court cannot grant summary judgment on the issue of plaintiff's comparative negligence alone because "federal maritime law embodies a system of 'pure' comparative negligence, that would suffice to preclude

---

[12] While walking boards are lacking in only ten percent of vessels that arrive in Camden, the majority of these vessels are like the M/V Alma, one time charters.

18

summary judgment." <u>Davis v. Portline Transportes Maritime Internacional</u>, 16 F.3d 532, 540 (3d Cir. 1994).  Summary judgment on plaintiff's negligence is not appropriate here because it cannot be decided as a matter of law that plaintiff's negligence was 100% and Alder's was 0%.  <u>Id.</u>

In sum, while we conclude that no reasonable jury could conclude that the absence of walking boards was a latent danger, we are equally convinced that sufficient evidence exists for a jury to determine: a) whether a practical solution existed to remedied any defect in the way Alder presented the cargo for discharge; or b) whether Alder acted reasonably in assuming the longshoremen would have avoided the danger.  Accordingly, we deny Alder's motion for summary judgment.

**B. Del Monte Defendants**

Plaintiff also brought claims against Del Monte N.A., Fresh Del Monte Produce Inc., and Del Monte Fresh Produce Company.  As a primary matter, the claims against defendants Fresh Del Monte Produce Inc. and Del Monte Fresh Produce Company should be dismissed.  Defendants argue that these companies had no involvement with the M/V Alma, the operations at Broadway Terminal, or the plaintiff's injury.  In his brief, plaintiff agrees with defendants' argument and offered to drop his claims against these two defendants.

As for the remaining defendant, Del Monte N.A. argues

19

that a longshoreman has no cause of action against a terminal
operator under the LHWCA or federal maritime tort law except
where exceptional circumstances create a duty of care on the part
of the terminal operator not to create dangers.  There appears to
be no dispute Del Monte N.A. acted as the terminal operator.
Plaintiff argues that Del Monte N.A. can be liable under the
LHWCA because it also acted as the charterer of the M/V Alma.  As
previously noted, a longshoremen can bring an action against a
vessel when his injuries are caused by that vessel's negligence.
33 U.S.C. § 905(b).  A vessel is defined as the "vessel upon
which or in connection with which any person entitled to benefits
under this chapter suffers injury or death arising out of or in
the course of his employment, and said vessel's owner ... [or]
charter ...."  33 U.S.C. § 902(21).

        We hold that Del Monte N.A.'s duty is not governed by
the LHWCA because it is not a "vessel" for the purposes of §
905(b) of the LHWCA.  Mullen v. Alicante Carrier Shipping Corp.
II, 2004 WL 2203723 (E.D.Pa. Sept. 29, 2004).  In his deposition,
Frank Timothy Albano, Vice President of Vessel Scheduling, North
American Port Operations for Del Monte N.A., repeatedly says that
"we charter vessels" when he is explaining the manner in which
the M/V Alma arrived in Camden.  (Albano Dep. 13, 14, 16.)
However, these comments do not fulfill plaintiff's burden of
persuasion.  Albano later goes on in that same deposition to

20

clarify that Network Shipping Company actually charters the
vessels and calls Network Shipping "the shipping arm for Del
Monte."  (Id. at 69.)  Plaintiff chose not to name Network
Shipping Company as a defendant.  In an affidavit attached to Del
Monte N.A.'s reply brief, Albano asserts that he was using "we"
to refer to "the affiliated companies who contribute to the
carriage and importation of fruit and produce into U.S. for sale
under the Del Monte brand."  (Albano Aff. 3.)  Further, Del Monte
N.A. clearly told plaintiff in an answer to an interrogatory that
Network Shipping Co. was the charterer of the M/V Alma.[13]  (Defs.
Inter. 3.)  Therefore, this Court finds that no reasonable jury
could conclude that Del Monte N.A. was the charter of the M/V
Alma after weighing the explanatory comments by Albano against
defendant's evidence to contrary.[14]

     Instead of the LHWCA, federal maritime tort law governs
plaintiff's claim against Del Monte N.A.  <u>Goldsmith v. Swan</u>

---

[13] Del Monte N.A. attached the charter agreement to their
answer to this interrogatory.  Neither party highlighted any
section of the agreement to the Court.

[14] If this Court were to have found that Del Monte N.A. was
the charterer of the M/V Alma, then plaintiff's claim would have
been governed exclusively by the LHWCA.  <u>See</u> 33 U.S.C. § 905(b)
("[t]he remedy provided in this subsection shall be exclusive of
all other remedies against the vessel except remedies available
under this chapter"); <u>Wheelings v. Seatrade Groningen, BV</u>, 516
F.Supp.2d 488, 496 (E.D.Pa. 2007).

Reefer A.S., 173 Fed. Appx. 983, 988 (3d Cir. 2006).[15]  The
standard applicable under federal maritime tort law is "the duty
of exercising reasonable care under the circumstances of each
case." Id. (quoting Kermarec v. Compagnie Generale
Transatlantique, 358 U.S. 625, 632 (1959)).  So far, no Third
Circuit case has been willing to "impos[e] a duty of care on the
terminal operator toward third parties such as longshoremen ...."
Goldsmith, 173 Fed. Appx. at 989.

       In Goldsmith, a longshoreman brought an action against
Del Monte N.A., the terminal operator, after a sudden severe list
of the ship caused a container to swing wildly from one of the
two cranes simultaneously in use and strike the plaintiff.  Id.
at 985.  Plaintiff argued that the time constraints imposed by
Del Monte N.A. and its involvement in the stevedore's operations
made it responsible for the use of two simultaneous cranes.  Id.
at 989.

       The Third Circuit upheld the awarding of summary
judgment in favor of Del Monte N.A., reasoning that the procedure
of unloading the ship was exclusively under the control of the

---

[15] While this Court bases its subject matter jurisdiction on
diversity, the liability of Del Monte N.A. is still determined by
federal maritime tort law because plaintiff was injured aboard a
ship in navigable waters. See Kermarec v. Compagnie Generale
Transatlantique, 358 U.S. 625, 628 (1959); see also Binder v.
McVey, 2008 WL 219971 at *2 n. 2 (D.V.I. Jan. 02, 2008) (listing
lower courts that have used federal maritime law in diversity
cases).

stevedore.  _Id_.  The court held that evidence of Del Monte N.A.'s
knowledge of the practice of using two cranes was not sufficient
to survive summary judgment because it was the improper use of
the two cranes, something within DRS's control, that caused the
injury.  _Id_.  The court stressed that Del Monte N.A. was not an
expert stevedore.  _Id_. at 990.  The court also noted that Del
Monte N.A. did not provide any of the injury-causing equipment
and was not aware that the practice of using two cranes was
dangerous.  _Id_.  However, the Third Circuit "decline[d] to state
that a port operator never has a duty to intervene in an unsafe
practice or to correct an unsafe condition."  _Id_.  Generally,
stevedores, not terminal operators, are responsible for ensuring
the safety of longshoremen.  _Scindia_, 761 F.2d at 170.

        Instead of creating a blanket rule, the Third Circuit,
in _Goldsmith_, distinguished the facts from _Mullen_, a case where a
court in the Eastern District of Pennsylvania denied summary
judgment on a stevedore's negligence claim against Del Monte N.A.
_Id_.  In _Mullen_, the longshoreman's shoulder was injured while
removing slings from pallets of fruit so that they could be
loaded onto forklifts.  _Mullen v. Alicante Carrier Shipping
Corp._, 2004 WL 1737493 at *1 (E.D.Pa. August 03, 2004).
Allegedly, a knot caused the sling to get stuck on the pallet and
plaintiff was injured when he went to pull the sling away.  _Id._
The Third Circuit distinguished _Goldsmith_ by reasoning that in

23

Mullen, Del Monte N.A. provided the defective slings that allegedly injured the plaintiff and had received complaints about the slings.  Goldsmith, 173 Fed. Appx. at 989.

Here, the facts show that plaintiff's claim can be more closely analogized to Goldsmith than it can be to Mullen. Plaintiff argues that Del Monte N.A. was aware of longshoremen unloading fruit without walking boards and that Del Monte N.A. knew such a practice was dangerous.  Testimony by Del Monte N.A. employees suggests that it supplied plywood to DRS for the purpose of making walking boards kept in Camden and specifically selected not to equip the M/V Alma with walking boards in Costa Rica.  Further, DRS requested that ships come into Camden already equipped with walking boards.

However, plaintiff has submitted no evidence that Del Monte N.A., the terminal operator, took control of unloading fruit from incoming vessels away from the stevedoring company. The record shows that Del Monte N.A. repeatedly requested that DRS fulfill this task.  Even though DRS suggested in its correspondence that vessels come into port already equipped with walking boards, DRS never indicated that it relinquished the responsibility for placing the walking boards to Del Monte N.A. In his deposition, John Hamilton, a DRS supervisor, acknowledged that it was DRS's responsibility to place walking boards down if a ship came into port without them.  (Hamilton Dep. 21.)

Plaintiff has not alleged that the plywood supplied by Del Monte N.A. was defective or caused his injuries. Instead, it was the failure to use these walking boards that allegedly caused the injury. Indeed, all of the evidence shows that Del Monte N.A. was the party that was insisting that the injury-causing defect be remedied. Further, plaintiff's argument concerning Del Monte's knowledge of the dangerousness of the lack of walking boards is not supported by the evidence. While DRS was concerned that a lack of walking boards posed a risk to their employees, Del Monte N.A.'s concern about the lack of walking boards was solely focused on maintaining the quality of their fruit.

In the end, plaintiff's argument devolves into a contention that the terminal operator has a duty to require walking boards on all vessels discharging cargo at its terminal even where the obligation to discharge the cargo has been contracted out to a stevedore. No such blanket duty exists. Therefore, we hold that under the undisputed facts of this case that Del Monte N.A. had no duty to intervene in the operations of an expert stevedore and that it is entitled to summary judgment as a matter of law since no reasonable jury could conclude that its role was anything other than a terminal operator.

## III. Conclusion

For the foregoing reasons, Alder Shipping Company's

25

motion for summary judgment is denied and the Del Monte
defendants' motion for summary judgment is granted.  An Order
consistent with this Opinion will be entered.


At Camden, New Jersey

Dated: August 8, 2008                    S/Noel L. Hillman
                                    NOEL L. HILLMAN, U.S.D.J.

26